# EXHIBIT A

L71zzMEDSsj

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

                v.                20 Cr. 24 (JGK)

JAIME BAEZ-MEDINA,               SENTENCE

              Defendant.

------------------------------x

                           New York, N.Y.
                           July 1, 2021
                           1:04 p.m.

Before:

            HON. JOHN G. KOELTL,

                      District Judge

              APPEARANCES

AUDREY STRAUSS
    United States Attorney for the
    Southern District of New York
REBECCA T. DELL
MICHAEL D. MAIMIN
    Assistant United States Attorneys

FEDERAL DEFENDERS OF NEW YORK, INC.
    Attorneys for Defendant
AMY GALLICCHIO
ISAAC WHEELER

Also Present:

Jill Hoskins, Interpreter (Spanish)
James Hontoria, Interpreter (Spanish)

L71zzMEDSsj

(In open court)

(Case called)

THE DEPUTY CLERK: All parties please state who they are for the record.

MS. DELL: Rebecca Dell and Michael Maimin for the government.

MR. MAIMIN: Good afternoon, your Honor.

THE COURT: Good afternoon.

MS. GALLICCHIO: Good afternoon, your Honor.

Federal Defenders by Amy Gallicchio, along with Isaac Wheeler, on behalf of Jaime Baez-Medina.

THE COURT: Okay. Good afternoon, everyone.

I received the presentence report prepared January 22, 2021, revised March 12, 2021, together with the sentencing recommendation and the addendum. I received the defense submission dated March 26, May 28, June 24, 2021. I received the government's submission dated May 14 and June 8.

It's useful at the outset to explain the Court's calculation of the guideline sentencing range in this case. The parties can then make their objection or any arguments. I have carefully reviewed all of the submissions, allowing me to make the guideline sentencing range calculation first, and allowing the parties then to direct their attention to the Section 3553(a) factors.

By the way, since we're wearing masks, if at any time

someone can't hear me, just let me know.

The government contends that the base offense level is 24, as set forth in Section 2K2.1(a)(2) of the current guidelines, because the defendant committed the current offense subsequent to sustaining at least two felony convictions for a controlled substance offense.

The defendant disputes that he had two prior controlled substance offenses, within the meaning of the guidelines. The parties agree that the defendant's 2010 conviction in state court for criminal sale of a controlled substance in the fourth degree, in violation of New York Penal Law, Section 220.34(5), based on a sale of methadone, is a qualifying controlled substance offense; see ECF No. 40 at page 3, note 1.

The parties dispute whether the defendant's convictions in state court in 2004 and 2011, were qualifying controlled substance offenses for purposes of Guideline Section 2K2.1(a)(2).

Having considered all of the lengthy submissions, the court concludes that neither conviction is a qualifying conviction. The defendant was convicted in 2004 of a violation of New York Penal Law, Section 220.34.

The government argues that the defendant's 2004 conviction must have rested on a subsection other than subsections (7) or (8) of New York Penal Law, Section 220.34

and, therefore, should be considered categorically a controlled substance offense.

The parties agree that subsections (7) and (8) cover substances broader than controlled substances under federal law, but the other subsections do not. The categorical approach is used to interpret individual statutes describing only one crime; whereas, the modified categorical approach is used to compare divisible statutes, statutes with different elements in the alternative, creating multiple crimes.

The modified categorical approach is used to determine which elements of the alternatives listed in the statute were necessarily found or admitted as a basis for the matching analysis. New York Penal Law, Section 220.34 is divisible because there are separate crimes listed.

The government argues that pursuant to the modified categorical approach, the defendant's 2004 conviction could not have rested on subsection (7) or (8), and that the remaining subsections are a categorical match to federal controlled substances offenses. Subsections (7) and (8) prohibit substances not controlled by federal law, meaning that if the defendant could have been convicted pursuant to those subsections, the conviction cannot be considered categorically a match for controlled substances offenses under federal law.

Both parties assume that the other subsections of the New York statute are a categorical match to federal law;

therefore, the issue is whether the government can prove that defendant's 2004 conviction could not have rested on subsections (7) or (8) of the New York statute.

Subsections (7) and (8) require that the illicit substances be sold on school grounds, a school bus, or a childcare center. While the defendant's plea allocution did not include any mention of being on school grounds or school bus or at a childcare center, the Court cannot infer the subsection under which the defendant was convicted, because the defendant did not need to plead to all the elements of the offense for which he was convicted.

The defendant was originally charged with a Class B felony, pursuant to New York Penal Law, Section 220.39(1), see ECF No. 47, f1. As part of the plea agreement, the defendant pleaded to a Class C felony, pursuant to New York Penal Law, Section 220.34. However, pursuant to New York state law, when a defendant pleads guilty to a lesser-included offense, as part of a plea bargain, the defendant need not admit the facts charged against the defendant in the indictment or the lesser included offense; *see People v. Griffin,* 160 N.E. 2d 684, 686, (N.Y. 1960).

In fact, because plea bargains in New York can be compromises between the defendant and the state, convictions pursuant to plea bargains may relate to a hypothetical situation without objective basis; *People v. Foster,* 225 N.E.2d

200, 202 (N.Y. 1967) *quoting Griffin,* 166, N.E. 2d at 686. Therefore, when accepting a guilty plea pursuant to a plea bargain, it is unnecessary for a court to establish a factual basis for the particular crime confessed; *People v. Clairborne,* 280 N.E.2d 366, 367 (N.Y. 1972). *See also People v. Falbo,* 105 N.Y. Supp. 3d 721, 723 App Div 2019.

In the case of Mr. Baez's 2004 conviction, the state court did not need to establish a factual basis for the conviction, pursuant to New York Penal Law, Section 220.34, because the plea was entered pursuant to a plea bargain; therefore, the record cannot establish under which subsection of the New York statute the defendant was convicted.

Because the statute as a whole cannot be considered categorically a controlled substance offense, under federal law, the defendant's 2004 conviction cannot be a controlled substance offense, pursuant to Sentencing Guidelines 2K2.1(a)(2). The Court cannot infer that the 2004 conviction must have rested on one subsection rather than another, based on an absence of the facts in a plea allocution, because the defendant did not need to be allocated to the facts of any particular subsection.

The defendant argues that his 2011 conviction, pursuant to New York Penal Law, Section 220.39(1), cannot be considered categorically a controlled substance offense. In particular, the defendant argues that certain cocaine isomers

L71zzMEDSsj

are controlled by New York law that are not controlled by federal law; and therefore, the New York law is broader than the federal law and is not a categorical match.

New York law controls. "Coca leaves and any salt, compound, derivative or preparation thereof, which is chemically equivalent or identical with any of these substances, including cocaine and ecgonine, their salts, isomers, and salts of isomers, except that the substance shall not include decocainized coca leaves or extraction of coca leaves, which extractions do not contain cocaine or ecgonine." New York Health Law, Section 3306, Schedule 2(b)(4).

The Federal Controlled Substance Act controls. "Coca leaves, 9040, and any salt, compound, derivative or preparation of coca leaves, including cocaine, 9041, and ecgonine, 9180, and their salts, isomers, derivatives, and salts of isomers and derivatives; and any salt, compound, derivative or preparation thereof, which is chemically equivalent or identical with any of these substances," with exceptions not relevant in this case. 21 CFR, Section 1308.12(b)(4).

In this match between the statutes concerns the term "isomer". The New York statute does not specifically define "isomer", but included isomers of cocaine in its list of controlled substances. Whereas, the federal law defines "isomer" to include only known "optical and geometric isomers" of cocaine, 21 CFR, Section 1300.01(b).

By the way, I should have mentioned at the outset, we have an interpreter. Is the interpreter on staff or does the interpreter have his oath on file?

THE INTERPRETER: Yes, your Honor. My oath is on file.

THE COURT: Could you state your name, please, for the record.

THE INTERPRETER: James Hontoria, H-O-N-T-O-R-I-A.

THE COURT: Thank you.

Have you been translating since the beginning of the proceeding?

THE INTERPRETER: Yes, I have.

THE COURT: Thank you very much.

So let me continue.

The government argues that nonoptical and nongeometric isomers of cocaine are not controlled by New York law because they are not chemically equivalent to cocaine. Because the New York statute does not define "chemical equivalent," the government first proposed to define "chemical equivalent" as "having a similar chemical environment, simplified by atoms being attached by similar molecules."

The defendant counters that the government's definition of "chemical equivalence" is too narrow, comparing atoms with a molecule rather than comparing molecules to each other. Under the government's definition of "chemical

L71zzMEDSsj

equivalence," no isomers of cocaine would be chemically equivalent to cocaine.

In reply, the government argues that the text in the legislative history of the New York statute indicate that the inclusion of the, "isomers" in the statute was designed to capture solely the dextrose isomer of cocaine, which is also controlled by federal law. However, the government's textual argument misreads the New York statute. The New York statute under a plain reading suggests that "cocaine and ecgonine, their salt, isomers and salt isomers" can be chemically equivalent to "coca leaves" or any "salt, compound, derivative or preparations thereof" and are controlled by New York state law.

Put differently "isomers" are specifically included in the subset of molecules that can be chemically equivalent or identical with coca leaves or any salt, compound, derivative or preparation thereof. That is the definition that the New York State Legislature has given us. The New York state statute controls cocaine and all isomers of cocaine; while the federal statute controls only the optical and geometric isomers of cocaine.

The legislative history also counsels against the government's interpretation of the statute. The government argues that the inclusion of the term "isomers" in the New York statute was designed to counter the isomer defense, which

posited that the dextro isomer of cocaine, before the inclusion of isomers in the statute, was not prohibited by state or federal law. However, the sponsor's memorandum of the bill that amended the statute to prohibit isomers of cocaine stated that the problem of the dextro isomer defense "could be resolved by enacting this amendment, which would include all isomers of cocaine." The sponsor's memo, Bill Jacket Law 1978, Chapter 100, New York, Defense Exhibit D.

This legislative history belies the government's contention that the statute was designed to prohibit just the dextro isomer of cocaine, because it made clear that the chosen solution of the New York State Legislature to deal with the dextro isomer offense was to prohibit all isomers or to control all isomers of cocaine. Whether wise or not or overbroad or not, the provisions of the New York state law should be understood as drafted until amended. The federal law pursued the narrower path of prohibiting geometric and optical isomers.

Accordingly, under a plain reading of the New York statute, and when considering the legislative history and intent of the provision, the New York statute controlled all isomers of cocaine, while federal law only controls geometric and optical isomers of cocaine. *See United States v. Fernandez Tavares,* 2021 WL 66485 *5 (E.D.N.Y. January 7, 2021). "As a result of the difference in the definitions of cocaine under New York law and federal law, possession of certain cocaine

L71zzMEDSsj

isomers is illegal under the New York statute, but legal under the Controlled Substance Act."

Therefore, the 2011 conviction cannot be considered a controlled substance offense pursuant to Sentencing Guideline Section 2K2.1(a)(2). It is unnecessary to reach the defense argument that the 2011 New York state conviction is also not a categorical match for the federal controlled substance offense because the New York statute included naloxegol as a controlled substance.

While the Federal Controlled Substance Act excludes naloxegol today and the Court should compare the scope of the New York statute at the time of conviction with the scope of the federal statute today, that is a question that is pending for decision before the Court of Appeals for the Second Circuit. See *United States v. Gibson* 20-3049, and has divided district courts and other courts of appeals.

It is unnecessary to answer that question in this case because the broader inclusion of isomers of cocaine render the New York statute broader than its federal counterpart at the time of the defendant's 2011 conviction and today. Therefore, the proper offense level is 20 under Section 2K2.1(a)(4), because the defendant indisputably committed the instant offense or the current offense subsequent to sustaining one felony conviction for a controlled substance offense, not two. The 2010 conviction is indisputably one controlled substance

offense.

The probation department recommended a two level enhancement under Section 2K2.1(b)(4), because the firearm was stolen. The defendant objects to this enhancement because the enhancement was not based on empirical evidence and increases the guideline without a sound basis. The Court can certainly take into account that a guideline is not well-founded, but there certainly is an understandable effort in the guidelines to discourage the possession of a stolen firearm. That is certainly a justification for the enhancement.

In any event, there is no question that the guideline applies in this case, because there is no dispute that the firearm was stolen. There is no dispute that the defendant possessed a stolen firearm; therefore, the two-level enhancement is appropriate under Section 2K2.1(b)(4). Therefore, the total offense level is 22; 20 under Section 2K2.1(a)(4)(a), and 2 under Section 2K2.1(b)(4). The defendant is entitled to a three-level reduction under Section 3E1.1 for acceptance of responsibility.

The total offense level is, therefore, 19; the Criminal History Category is VI; and the guideline sentencing range is 63 to 78 months.

All right. I will now call on each of the parties, as I always do: Defense counsel, the defendant, and the government, asking if there are any objections to the

L71zzMEDSsj

presentence report and then for any statements that the parties would like to make. You are welcome to make any discussion or objections to what I've already said, in addition to any objections that you may want to lodge with respect to the presentence report.

As you know, I always ask those two questions because if there are objections to the presentence report, I have to either resolve them or determine that they don't affect the sentence, so it's important for me to ask that question. And it's also important for me to ask the second question, which is, I'll listen to each of the parties for anything they wish to tell me in connection with sentence. And so, as I said, you can give me any objections to the presentence report, as well as any objections to what I already said.

So Ms. Gallicchio, have you reviewed the presentence report, the recommendation, and the addendum? Have they been translated for the defendant? And have you discussed them with the defendant?

MS. GALLICCHIO: Yes.

Good afternoon, your Honor.

I have read the presentence report and the addendum. Mr. Baez does speak English very well, your Honor, but is more comfortable in today's proceeding with an interpreter. While I did not translate the document, I did speak with him at great length about it and was confident that he understood it.

L71zzMEDSsj

THE COURT: Thank you.

MS. GALLICCHIO: I have no further objections. The objections that we raised in the presentence report noted on page 31 have already been addressed by the Court.

Beyond that, I have no further objections.

THE COURT: All right.

I'll listen to you for anything that you would like to tell me in connection with sentence, any statement you'd like to make, anything at all you'd like to tell me.

MS. GALLICCHIO: Yes. Thank you, your Honor.

At this point, your Honor, Mr. Baez has now been in prison, in jail, in custody, for a total of 22 months from the moment he was first arrested by NYPD for the possession of this gun, which was on August 24, 2019. As I've indicated in my submission, your Honor, none of this time can be credited to this federal sentence that the Court will impose today; and that is because he is in primary state jurisdiction.

He was arrested by federal authorities on January the 6th, 2020, at Riker's Island, and then transferred into BOP custody. But at that time, a detainer was already lodged against him for the pending Bronx matter for which he is pending sentencing. And so while all of the state firearm offenses were dismissed when he was arrested on federal charges, he was also in custody, remanded on that Bronx matter that I outlined in my papers.

L71zzMEDSsj

THE COURT: Just so that I'm clear, I understand the statement that the defendant will not receive credit towards his federal sentence until the day that he's sentenced, today, because he has primary jurisdiction in the state court. His time in detention will be credited to the state court offense for which he faces a five-year sentence, which the state court judge has indicated the state court judge will run concurrently with the federal sentence.

MS. GALLICCHIO: Yes, that's correct, your Honor.

THE COURT: Again, so that I'm clear, the 22 months that the defendant has spent in state custody will come from his five years on the state court conviction, so that the defendant has about two and-a-half years left on his state court conviction, correct?

MS. GALLICCHIO: I think he would have a little more than that. He would have approximately 40 months. He's expecting a sentence of 60 months, five years on that. Subtracting 21 months from that would be approximately 40 months. I'm assuming in the state court there will be some time or time credited, so it's likely he wouldn't serve the entire 40 months, but that would be the remainder on that sentence.

THE COURT: Will the defendant spend the remainder of his sentence in state custody or in federal custody, when the state court judge says he wants the state sentence to run

L71zzMEDSsj

concurrently with the federal sentence? I would have thought that there's some thought out there that some defendants would prefer to be in federal rather than in state custody.

MS. GALLICCHIO: Yes. I don't know the answer to that question, actually. My instinct tells me that he will be in state custody because that is the primary jurisdiction. I don't know whether there's a mechanism by which to change that.

THE COURT: Okay.

MS. GALLICCHIO: Your Honor, as we've asked, we have asked for a sentence of time served. But understanding that that may not be what the Court is contemplating, we're asking the Court that whatever sentence the Court imposes, that the Court run it concurrent to the sentence that is yet to be imposed in state court; and that is because it is our position that a total sentence of five years is sufficient to serve the interests of 3553(a) and the rules of sentencing.

And I've also outlined the reasons for that in my sentence submission, and I'll briefly outline the mitigating reasons now why I think that's appropriate in this case.

First, your Honor, I want to talk about something the Court has heard many times, of course, which are the conditions of confinement that Mr. Baez has suffered in the last 22 months and, in particular, since he was transferred into federal custody in January and when the pandemic began. And even before then, your Honor, as I outlined in our papers --

L71zzMEDSsj

THE COURT: Can I stop you, Ms. Gallicchio.

We actually have two interpreters, I see. Could the second interpreter please indicate your appearance on the record and tell me whether your oath is on file.

THE INTERPRETER: Jill Hoskins, staff interpreter, oath on file.

THE COURT: Okay. And between you and the other interpreter, have the proceedings been continually translated from the outset?

THE INTERPRETER: Yes, they have, your Honor.

THE COURT: Thank you.

Go ahead, Ms. Gallicchio.

MS. GALLICCHIO: Your Honor, the last 22 months have been brutal for Mr. Baez, and certainly since February of last year right at the beginning of the pandemic. He suffered through a lockdown related to a rumor that there was -- and ultimately found -- a firearm inside the MCC, a terrifying and unbelievable event that created great trauma for not only Mr. Baez, but many other people. The firearm itself was actually found in Mr. Baez's unit; so, again, added a fear level of later realizing the danger that he was in. He has been incarcerated for the life of the pandemic, so he has seen it all and experienced it all. And not only that, your Honor, he has been incarcerated in one of the toughest and harshest federal detention facilities in the country, infamously so.

L71zzMEDSsj

I know the Court is well aware of the suffering of inmates at the MCC. And again, a terrifying experience, and one that is a real, live experience for Mr. Baez. And obviously, we cannot underestimate the severity of the experience, no matter how many times we hear these stories.

During one phone call, your Honor, I had with Mr. Baez, I told him to stay positive. And he responded to me, Ms. Gallicchio, I'm trying, but it's hard to stay positive in here. It has been traumatizing, dehumanizing, and demoralizing. I don't think I can stress that enough.

And the question is -- and I know the Court has considered this question -- what is that worth? Does it warrant a sentence reduction beyond what the Court would normally sentence? I submit to the Court that it does deserve a significant sentence reduction, and indeed that has been the trend in this district. And of course, beyond the pandemic, as I've already said, your Honor, the totality of the brutal conditions on a good day at MCC, they are, for all intents and purposes, deplorable and intolerable, as has been called out by judges in this courthouse over and over again.

And so, your Honor, I submit to the Court, based on those factors, Mr. Baez has experienced a level of punishment by far disproportionate to the crime.

Second, your Honor, I ask the Court to look at the personal history and characteristics of Mr. Baez. He is a man

L71zzMEDSsj

who is well aware, who has struggled for all of his adult life with his debilitating drug addiction. It has resulted in countless arrests; 57 misdemeanor convictions, four felony convictions, all enmeshed with his addiction. It has cycled him in and out of jail, in and out of his life, and in and out of rehab facilities.

Your Honor, I think what's important about those arrests is that there's no history of violence. These arrests are clearly as a result of -- motivated by his drug addiction. It's affected other parts of his life as well. It's affected his health. It's in the motion papers. It has affected his relationship with his family, who worries about him endlessly.

THE COURT: One of the unusual aspects of the history is an argument in favor of a sentence that the defense seeks, is that the defendant's family cares for him and will take care of him when released, provide him with a job. And I ask myself, Where has the family been for years and years and years through 60 convictions? And then I ask myself, How realistic or credible is it that now, after all of these years, the family says they've always cared, they've always been there, and of course, the defendant will have a job and they will take care of the defendant.

MS. GALLICCHIO: Your Honor, perhaps I should have been clearer maybe in my papers, but I will say that the family has been there. The problem has been that Mr. Medina has not

L71zzMEDSsj

let them help him. He has not reached out for help. His mother and father are in Puerto Rico, and they're elderly. When they were younger, they tried to reach out; they tried to offer him help. And like so many people struggling with addiction, he wasn't ready for it. His brother, who is a hardworking guy, lives in Florida, who I've been in touch with on many occasions, has done the same thing. But to some degree, as his brother pointed out, Mr. Baez was like a lone wolf floundering in New York City. And at times, they didn't even know where he was because his drug addiction took over his life so much.

And so it is a good question; but from what I know from this family, I know that they've been there and they tried. And sometimes family can only do so much until their loved one gets ready to accept the love and the care that they are offering. And for a long time, Mr. Baez was not ready, clearly, for decades probably. But this experience, where he is now in his life, his age, the depths that he's reached in his addiction, he's ready. He can't go anywhere else. There's nothing further below that he can get to. He's reached rock bottom at this point, and this really is his last chance, regardless of whatever sentence the Court imposes.

At 48 years old, your Honor, he can't continue this lifestyle or he's not going to survive. And so, look, we have to have faith and hope for the best. Obviously, we can't

L71zzMEDSsj

predict the future, but I know from my interactions with Mr. Baez, the sincerity of his convictions now, I think it has been as a result of his incarceratory experience that has really shaken his soul.

And so in answer to the Court's question, they are there to the extent that they have tried, and tried like many parents who have loved ones struggling with addiction. And I'm hopeful, based on my interactions with Mr. Baez and his expression of commitment and remorse and desire to change, that he can do it with, of course, the support of his family.

THE COURT: The defendant has been in custody for 22 months. How has the defendant done with respect to remaining drug-free while in custody? Any disciplinary proceedings with respect to possession of drugs?

MS. GALLICCHIO: No, your Honor. He's done well, despite -- as the Court knows, despite the presence, certainly, of drugs at the facility.

THE COURT: The defendant has been on methadone --

MS. GALLICCHIO: Yes.

THE COURT: -- in prison?

MS. GALLICCHIO: That's correct. And that certainly has helped. And he needs it, unless and until he can detox from methadone at some point in his life, your Honor.

I think where we're at then is what is the need for the sentence, of course. I submit to the Court he has

L71zzMEDSsj

certainly been punished harshly and severely already. As I've already said, he's been deterred by this punishment and he's motivated to change. But what he needs is treatment. What he needs is help. He has not gotten -- other than methadone, methadone maintenance and medication, he's not had the intensive treatment therapy that he needs to overcome his addiction, largely because the prisons have been locked down for so long and programs have ceased. Hopefully that will change, but I don't know what the future will hold with respect to that. But as I suggested to the Court, the best treatment he can get is in the community, in a residential program, with his family to support him.

So, your Honor, I would submit to the Court that a sentence certainly in the range as the Court has found, even though, of course, it's lower than what probation has recommended and the government believes is appropriate, is still excessive and harsh based on all the mitigating circumstances I just laid out. And so our request is the same, that the Court consider a sentence of time served, or whatever sentence the Court imposes to run concurrent to the five-year sentence he is expected to receive on July the 8th, actually, next week, your Honor.

Thank you.

THE COURT: Okay.

Thank you, Ms. Gallicchio.

L71zzMEDSsj

Mr. Baez-Medina, have you reviewed the presentence report, the recommendation and the addendum, and discussed them with your lawyer?

THE DEFENDANT: (In English) Yes, I do, your Honor.

THE COURT: By the way, you're welcome to respond to me in English, if you prefer or in Spanish and have the interpreter interpret. Whatever you feel comfortable with.

THE DEFENDANT: (In English) I feel comfortable to respond in English, sir.

THE COURT: Okay.

Do you have any objection to the presentence report, the recommendation and the addendum, other than what your lawyer has already said and I've already dealt with?

THE DEFENDANT: (In English) No, your Honor.

THE COURT: I'll listen to you for anything that you would like to tell me in connection with any sentence, any statement you would like to make, anything at all you would like to tell me.

THE DEFENDANT: (In English) First and foremost, good afternoon to everybody.

Your Honor, its been hard, not only this two years. I've been in this addiction almost all my life. I need help. You the only one who can give me the help that I need. I got my family in my corner right now.

You just mention, where is the family all this time?

L71zzMEDSsj

Thank you for mentioning it. Now I got it. Now it's in my corner. I see my team. I got it, your Honor. My family is in my corner and will help me.

I would like you to give me the sentence, whatever you give me, just please run it together and send me to a program or a treatment residential program and I can do it. I can do better than jail. I would like to get a program, a residential program. I going to 48 years old and I don't got nothing.

The only thing I got is my family, and they willing to help me. I know I did wrong. And you can see, I never got gun problem in my life. The only thing I got is drug problems. Please, I begging you, your Honor, give me anything you can give me to run it together. I got my family. I just need one more chance. Thank you.

THE COURT: All right.

Thank you, Mr. Baez-Medina.

Has the government reviewed the presentence report, the recommendation, and the addendum?

MS. DELL: Yes, your Honor.

THE COURT: Does the government have any objections?

You're welcome to raise any objections you have.

MS. DELL: We just object to the Court's finding that the 2004 and 2011 convictions cannot be considered controlled substance offenses. Other than that, we rely on our papers. Aside from that, we do not have any objections.

L71zzMEDSsj

THE COURT: Okay.

I'll listen to you for anything you'd like to tell me in connection with sentence.

MS. DELL: I believe your Honor had one question which my colleague Mr. Maimin can speak on.

MR. MAIMIN: Your Honor, I just have the advantage of many years. Your Honor asked Ms. Gallicchio about where Mr. Baez-Medina will serve his sentence while there is still a running state sentence that's concurrent to a federal sentence, assuming that they run concurrently.

The answer is that while technically it's entirely up to the Bureau of Prisons and the New York State Department of Corrections to work it out, in my dealings with the Bureau of Prisons on this very issue over and over, their policy is that whoever has primary custody maintains actual custody during any joint custodial sentence until the termination of that sentence.

So if, to use easy numbers, Mr. Baez-Medina had one more year on a state sentence, and your Honor sentenced him to three years, he would serve the next year in the state, and then be transferred to the federal government.

Your Honor also asked if there's any way around that. And the answer is, I can think of ways to get around it; namely, to transfer primary jurisdiction by the state, choosing to bail Mr. Baez-Medina, wait for him to be picked up by the

L71zzMEDSsj

feds on a detainer, and then to revoke bail, that way they transferred primary custody.

However, in my experience, that's not going to happen. So the answer is -- my understanding of the policy is that Mr. Baez-Medina will serve the rest of his state sentence in state custody, even if there is a running federal sentence at that time, and then be transferred to federal custody for any remainder sentence that this Court has imposed.

THE COURT: As I said to Ms. Gallicchio, my impression is that defendants often would prefer to be in federal custody because of the ability of some programs available in the federal system that are not available in the state system. But I don't know, from what both parties have told me, there's nothing that I can do to accomplish that.

MR. MAIMIN: That's right, your Honor.

Also, I just wanted to raise one other purely technical matter regarding your Honor's ruling before I leave it to Ms. Dell, which -- and obviously, we disagree with your Honor's ruling, but it was a thoughtful ruling; but there was one specific issue that I just want to make sure that we were on the same page, at least about what our argument is.

THE COURT: Sure.

MR. MAIMIN: And that's the grammatical argument dealing with New York Public Health Law, Section 3306. Your Honor seems to recognize that that's an extremely important

L71zzMEDSsj

part of the discussion and determination.  And as I understood the Court, the Court's idea was -- because it says, including cocaine and its isomers, to abbreviate, that that was how the state law was defining "chemical equivalence".

And the reason that I take issue with that is both historical and grammatical.  Historically, the statutes before the legendary 3306, refer to chemical equivalence.  And, in fact, that was part of the issue in the isomer, that it's not a chemical equivalent.  It wasn't undefined, although it's not terribly defined, the term being defined for the first time by this statute.  But more importantly, there's the fact that this led to an odd grammatical reading.

And if I may give a counterexample or hypothetical. The Court and I may disagree all day long about whether a BMW motorcycle is what we would consider, "a high performance motorcycle".  However, if a motorcycle dealership advertises. We have all of the high-performance motorcycles you need, including BMW, and all of its varieties, nobody would say that that motorcycle shop is thereby defining "motorcycle" to include BMW, sedan, coups and SUVs.  Rather usually, when you say something includes something else, the latter is a subset of the former.

And there may be something that conforms it here; that is, that tells the courts, hey, where there's a real issue with what is or is not chemically equivalent, this may help to

inform, we think, at least some isomers are chemically equivalent. I think it's grammatically odd to say that the subset defines the set, rather than the other way around.

I suspect your Honor disagrees, from your Honor's opinion; just wanted to make sure we were on the same page about what our argument was.

THE COURT: I do understand your argument. And you're right, I disagree. I think I have to read the statute as the legislature has left it to me. And it may not be the most artfully drafted statute, but there it is. And the most natural reading is the reading that I gave it, which is certainly supported by the legislative history as to the broad inclusion of isomers.

So perhaps the New York State Legislature was not sufficiently careful in their drafting, but I have to deal with the statute as it is. And with so much of what's been argued out in the papers, both with respect to isomers and naloxegol, all of this is fixable by the parties who should be fixing it. So the New York State Legislature -- if the arguments are that New York State Legislature has really controlled more than it really intended.

And with respect to naloxegol, if the Sentencing Commission were simply sufficiently staffed so that it could make a decision with one amendment to the guidelines, it could resolve the issue of naloxegol. And it is truly unfortunate

L71zzMEDSsj

that the parties have to spend as much time and effort in drafting these issues, which don't really go to the central issues that the Court ultimately has to decide under the 3553(a) factors. And yet, for example, in this case, it was only the initial briefs that touched on the 3553(a) factors, and then we went off to five additional briefs on naloxegol and isomers, which is not the way in which sentences really should be determined.

And by the way, if there's no solution from the Sentencing Commission -- and I have no idea what the prospects are for a fully constituted sentencing conviction -- the Second Circuit wouldn't decide this issue completely, perhaps; because the government has made it clear in its papers that while the issue of do you look at the sentencing guidelines at the time of conviction or at the time of sentence, it reserves the question of whether naloxegol is, in fact, controlled under state law; and it reserves that to another day.

So if the defense wins on *Gibson*, the government would fight out whether naloxegol is really controlled under state law in subsequent cases, so it will be another year until there's finally an answer.

MR. MAIMIN: I understand. I share your frustration, especially regarding the commission, where, as we know, some of the issues present -- not all of them, but some -- there was a proposed amendment to resolve some of the issues that did not

get through before the commission lost its quorum so many years ago. It was in 2016, I think, or 2017. Of course, the problem with the idea of New York state fixing the statute is they have a very different incentive because they aren't in front of your Honor.

As I think we've pointed out, their course of conduct shows that they don't think there is something to be fixed, because they don't treat naloxegol as a controlled substance. They don't treat scopolamine, which is a generic isomer for pain, which has 17 carbon atoms, 21 hydrogen atoms, one hydrogen and four oxygen, as a controlled substance.

THE COURT: Okay. Please.

The New York State Legislature is not deaf. There is an issue that is directly affected by New York state law. Plainly that's an issue that can be presented to the New York State Legislature. And even though it may not affect prosecution in the New York state courts, that doesn't mean that the New York State Legislature would fail to listen to what the effect of the New York state statute is on prosecutions in federal court. We have a federal system and these are legislators who look at issues and make decisions, so they made a decision with respect to isomers.

If that decision has untoward results that the New York State Legislature did not think are appropriate, the New York State Legislature can fix the New York state statute. And

L71zzMEDSsj

by your argument, it doesn't affect the New York state prosecution because New York state isn't prosecuting these other isomers anyway. So there have been, if memory serves me right, other fixes to the New York state statutes in order to make them consonant with the federal statute, so I leave it at that.

MR. MAIMIN: The last one that I recall, at least regarding the narcotic statutes, was in, I want to say, 1987 or '88. Sadly, I think your Honor is a bit more optimistic than I am on what the legislative intent is. But as your Honor says, we work with the statutes we're given, not the ones we wish we had. I just respectfully disagree with your interpreting the ones that we were given.

Just finally, in case your Honor was hoping for guidance from the Second Circuit, I think it's just worth pointing out that *Gibson* won't necessarily resolve everything because it's on plain error. In fact, I don't know of any Second Circuit cases currently pending on any of these issues that are not on plain error. So even if they find there's not plain error, that doesn't necessarily resolve the underlying question.

I do know that the government has started to take the official position in briefs submitted to the Second Circuit, including one submitted a week or two ago on the cocaine isomer naloxegol issues as well. But, again, those are only on the

L71zzMEDSsj

plain-error standard.

THE COURT:  What's the position that the government is taking?

MR. MAIMIN:  The same one that we took here.  I think that your Honor read those briefs, you would find it awfully familiar.

THE COURT:  As I read the briefs before me on this sentencing issue, they read like briefs submitted to another court.  They read like briefs submitted to a Court of Appeals. I don't usually get briefs written, just in terms of style, in the way that some of the briefs were written, so I suspect that they came from briefs submitted to another court.  So I checked the briefs in *Gibson*, they were not the briefs in Gibson.  I think I checked *Lucas*, and they didn't seem like the briefs submitted in Lucas either.

MR. MAIMIN:  I can tell you the genesis.

A, they will seem a lot more similar to -- and I'm trying to get the name of it, to the other district's brief -- Hadaya Johnson.  And I think you will find that they are a lot more similar.  The briefs in front of your Honor were actually written before the Hadaya Johnson briefs, but I certainly -- when we were preparing the argument, we saw where this was likely to end up one day.

THE COURT:  Okay.

MR. MAIMIN:  I hope your Honor wasn't offended by our

L71zzMEDSsj

more appellate-style brief.

THE COURT:  Okay.

MS. DELL:  Just briefly, your Honor.

Your Honor mentioned 3553(a) factors, and I'd like to just bring us back to those for a brief moment.  They were mentioned in our opening briefs, but just to remind the Court that the government believes that a significant sentence is necessary here in order to promote respect for the law and for the general and specific deterrence.

The defense noted herself, the defendant has over 60 prior convictions, and none of those prior conviction deterred the defendant from continuing to commit crimes, nor to commit the serious crime in this case.  Instead, this shows a pattern of a consistent disregard for the law, and the government believes that the defendant knew what he was doing was wrong.

As the facts in this case show, when the defendant had the firearm in this case and observed police officers, he put the firearm behind a van, likely because he knew he was not supposed to hold it.  These prior convictions did not deter him from committing this offense.

And the government also believes that a significant sentence is necessary here because of the seriousness of this offense.  While the firearm was not used in this case, again the firearm was just left on the ground.  And had the police not recovered it quickly, it's possible someone could have

L71zzMEDSsj

picked it up and used it.

In addition, the defendant was holding the firearm in some way that prompted someone to call 911 and alert the police. Had someone with nefarious intent seen the defendant with a firearm, there could have been a violent incident at night in the Bronx.

For those reasons, the government believes a significant sentence is warranted.

THE COURT: Thank you.

I'll place the presentence report, the recommendation and addendum in the record under seal. I'll place the parties submissions to me also in the record under seal. The parties should place their own submission in the record not under seal after redacting any personal-identifying information.

I adopt the findings of fact in the presentence report, except as I've already indicated. Therefore, as I've already indicated, I conclude that under the current guidelines, the total offense level is 19. The Criminal History Category is VI, and the guideline sentencing range is 63 to 78 months.

I appreciate that the guidelines are only advisory, and that the Court must consider the various sentencing factors in 18 U.S.C., Section 3553(a), and impose a sentence that is sufficient, but no greater than necessary, to comply with the purposes set forth in Section 3553(a)(2).

L71zzMEDSsj

The offense is serious, the possession of a firearm by a convicted felon. Moreover, the defendant has a substantial criminal history. The defendant is in Criminal History Category VI, the highest criminal history category. He has sustained over 60 criminal convictions. While most of the criminal convictions were for misdemeanors, the defendant also had several felony convictions for various controlled substance offenses. Prior sentences have not deterred the defendant.

There are mitigating circumstances. The Court appreciates the defendant's history of addiction and mental health problems, but the defendant has thus far been unable to conform his conduct to the law, even when given a chance by the state court. The Court appreciates that the defendant's addiction and mental health problems are mitigating circumstances.

In addition, the defendant's confinement has been particularly harsh because of the COVID restrictions that the defendant has lived under. The probation department concludes that the defendant's difficult history warrants consideration and suggests only a slight variance; but the probation 's calculation of the guidelines, which is much higher than that calculated by the Court, is appropriate.

In attempting to balance these variant factors, the Court concludes that a substantial sentence is necessary for purposes of deterrence and protection of the public. On the

L71zzMEDSsj

other hand, the Court must take into consideration the mitigating circumstances.

The Court also appreciates that the defendant has thus far, for almost two years, been able to control his conduct while in custody on a methadone maintenance program. It is also significant to the Court in determining the defendant's sentence to take into account the total sentence that will be served by the defendant since the defendant first came into custody of the state authorities. An incremental sentence is necessary, but the Court should take into account the total time that the defendant will have spent in custody.

The Court also takes into account the beneficial effects of a substantial period of supervised release. The defendant will receive treatment during supervised release, and any violation of supervised release will come before the Court.

So taking into account all these factors on balance in this case, the Court intends to impose a sentence of 48 months on Count One, to be followed by a three-year term of supervised release, with the standard conditions of supervised release in this district and those recommended by the probation department.

The Court will provide that the sentence is to run concurrently with the undischarged term of the defendant's state court conviction. The Court recommends that the defendant be admitted in the intensive residential substance

abuse treatment program of the Bureau of Prisons.

The Court will not impose a fine because the defendant lacks the ability to pay a fine, after taking into account the presentence report. The Court will not impose restitution because there is no victim under 18 U.S.C., Section 3263. The Court will impose a $100 special assessment.

The sentence is consistent with the factors in Section 3553(a); and it's sufficient, but no greater than necessary, to comply with the purposes of Section 3553(a)(2).

I've already explained the reasons for the sentence. Before I actually impose the sentence, I'll recognize defense counsel for anything defense counsel wants to tell me.

MS. GALLICCHIO: Your Honor, there's nothing else that I wish to add at this point. Thank you.

THE COURT: Before I actually impose the sentence, Mr. Baez-Medina, I'll recognize you for anything that you wish to tell me, anything you'd like to say, anything at all you'd like to tell me.

THE DEFENDANT: (In English) Your Honor, thank you. Thank you.

You give me my life back now. Now I just got -- I can't forget this time. Its gonna be two years in this pandemic situation, this bring -- really open my eyes. Thank you, Judge Koeltl. I don't know if I'm saying it correct. Thank you for your help. Thank you. Thank you for help me and

L71zzMEDSsj

thank you for help others I'm 47 years old. I suppose to be in my house trying to pick something to my kids, not here, you know.

Thank you. Thank you for everything.

THE COURT: Mr. Baez, thank you.

A couple of other comments, Mr. Baez-Medina.

I know from your submissions that you were thinking about the possibility of a job with your family down south. It could be that if that comes to pass, supervised release will be supervised by a judge in another jurisdiction. If you're supervised in this jurisdiction, any violation of supervised release comes to me. And I have a very good memory. And if you violated the terms of supervised release for whatever reason, you'd be back before me. Please don't let that happen.

The probation department does a very good job of supervising people, of making programs available to them. It's in their interest to look out after people that they supervise. So work with them. Assure yourself that you're never back here. Do you understand what I've said?

THE DEFENDANT: (In English) I understand.

THE COURT: All right.

I'll recognize the government for anything the government wishes to tell me.

MS. DELL: Nothing further.

THE COURT: All right. Let me make one final comment

L71zzMEDSsj

before I actually impose the sentence, just to finish the discussion that I had with the government.

The other solution that is out there and which is open to the government to pursue is to urge a different understanding of the categorical approach. That's a change that district courts can't make questionable, whether the Court of Appeals can make that change. But it is certainly odd that important decisions in the sentencing process depend upon such things as where does naloxegol and isomers of cocaine stand. So one would think that both the government and institutional defense organizations should think about that and think about to whom such arguments could possibly be made.

All right. Pursuant to the Sentencing Reform Act of 1984, it is the judgement of this Court that the defendant, Jaime Baez-Medina, is hereby committed to the custody of the Bureau of Prisons, to be imprisoned for a term of 48 months on Count One. The sentence is to run concurrently with the undischarged term of the defendant's state court conviction.

I recommend that the defendant be admitted to the intensive residential substance abuse program of the Bureau of Prisons.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of three years.

Within 72 hours of release from the custody of the Bureau of Prisons, the defendant shall report in person to the

probation office in the district to which the defendant is released. While on supervised released, the defendant shall comply with the standard conditions of supervised release in this district.

The defendant shall not commit another federal, state or local crime. The defendant shall not possess a firearm or destructive device as defined in 18 U.S.C., Section 921. The defendant shall refrain from any unlawful use or possession of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment, and at least two periodic drug tests thereafter, as directed by the probation officer. The defendant shall cooperate in the collection of DNA as directed by the probation officer.

The defendant will participate in an outpatient treatment program approved by the United States Probation Office, which program may include testing to determine whether the defendant has reverted to the use of drugs or alcohol.

The defendant must contribute to the cost of services rendered based on his ability to pay and the availability of third-party payments.

The Court authorizes the release of available drug treatment evaluations and reports, including the presentence investigation report, to the substance abuse treatment provider. The defendant must participate in an outpatient mental health program approved by the United States probation

L71zzMEDSsj

office.  The defendant must continue to take any prescribed medications unless otherwise instructed by the healthcare provider.  The defendant must contribute to the cost of services rendered based on his ability to pay and the availability of third-party payments.

The court authorizes the release of available psychological and psychiatric evaluation and reports, including the presentence investigation report, to the healthcare provider.

The defendant shall submit his person and any property, residence, vehicle, papers, computer, other electronic communication, data storage devices, cloud storage or media internet to a search by any United States Probation Officer and, if needed, with the assistance of any law enforcement.  The search is to be conducted when there is reasonable suspicion concerning violation of a condition of supervision or unlawful conduct by the person being supervised. Failure to submit to a search may be grounds for revocation of release.  The defendant shall warn any other occupants that the premises may be subject to search pursuant to this condition. Any search shall be conducted at a reasonable time and in a reasonable manner.

It is further ordered that the defendant shall pay to the United States a special assessment of $100, which shall be due immediately.

L71zzMEDSsj

I've already explained the reasons for the sentence. Does either counsel know of any legal reason why the sentence should not be imposed as I've so stated it?

MS. DELL: Not from the government.

MS. GALLICCHIO: No, your Honor.

THE COURT: All right. I'll order the sentence to be imposed as I've so stated it.

There's no waiver of the right to appeal, correct.

MS. DELL: Correct.

THE COURT: Okay. Mr. Baez-Medina, you have the right to appeal the sentence. The notice of appeal must be filed within 14 days after the entry of the judgment of conviction, so you should discuss this issue promptly with your lawyer. If you cannot pay the cost of appeal, you have the right to apply for leave to appeal *in forma pauperis*. If you request, the clerk will prepare and file a notice of appeal on your behalf immediately.

Do you understand?

THE DEFENDANT: Yes, I understand, your Honor.

THE COURT: As a matter of prudence, will the government move to dismiss all open counts?

MS. DELL: This is the only count.

THE COURT: Yes. As a matter of prudence, will the government move to dismiss any open counts?

MS. DELL: Yes.

L71zzMEDSsj

THE COURT: The reason that I say that is every now and then -- and this is probably not a case -- there is, for example, a plea to a lesser-included offense. And if there's no motion to dismiss any open counts, it ends up coming back to me. So as a matter of prudence, I usually ask the government to dismiss any open counts. It can't be harmful if no one thinks there is any open count. And it can only be helpful.

So the government moves to dismiss any open counts and the defense agrees, right?

MS. GALLICCHIO: Yes.

THE COURT: All open counts are dismissed on the motion of the government.

All right. Anything further?

MS. GALLICCHIO: No, your Honor.

MS. DELL: No, your Honor.

THE COURT: Thank you.

(Adjourned)

# EXHIBIT B

L7L8FERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                      20 Cr. 650 (NRB)
                                 17 Cr. 773 (NRB)

GREGORY FERRER,

              Defendant.

------------------------------x

                              New York, N.Y.
                              July 21, 2021
                              11:30 a.m.

Before:

                 HON. NAOMI REICE BUCHWALD,

                            District Judge

                      APPEARANCES

AUDREY STRAUSS
     United States Attorney for the
     Southern District of New York
BY:  MICHAEL D. MAIMIN
     Assistant United States Attorney

FEDERAL DEFENDERS OF NEW YORK INC.
     Attorneys for Defendant
BY:  ZAWADI S. BAHARANYI

SOUTHERN DISTRICT REPORTERS, P.C.

(In open court)

(Case called)

THE DEPUTY CLERK: Is the government present and ready to proceed?

MR. MAIMIN: Michael Maimin for the government. Good morning, your Honor.

THE COURT: Good morning.

THE DEPUTY CLERK: Is the defendant present and ready to proceed?

MS. BAHARANYI: We are, your Honor. Good morning. Zawadi Baharanyi on behalf of Mr. Gregory Ferrer.

THE COURT: Good morning.

MS. BAHARANYI: It doesn't appear that Mr. Ferrer has a microphone. I just noticed this. I am happy to share.

THE COURT: Since you will do most of the talking, when it's his chance, of course, you will share with him. I don't think it's practically going to be a problem, but we will make sure it gets attended to. Thank you.

So I think we kind of almost simultaneously realized that Mr. Ferrer had never pled to the supervised release violation. So why don't we begin with that.

So, the updated violation report bears the date of November 24, 2020.

So, Ms. Baharanyi, have you received that report?

MS. BAHARANYI: Yes, your Honor, I have received a

copy of it.

THE COURT: Have you had an opportunity to review it with Mr. Ferrer?

MS. BAHARANYI: We were able to review that report this morning, your Honor.

THE COURT: Have the parties reached an understanding?

MS. BAHARANYI: Yes. He will be admitting to Specification No. 2 today.

THE COURT: All right.

Mr. Ferrer, Specification No. 2 reads: "On or about October 28, the supervisee" -- that means you -- "possessed a firearm, to wit, a pink Cobra handgun, model CA-380, serial number unknown." And this possession is in violation of mandated condition. It also requires mandatory revocation and it is a grade B violation.

Have you discussed this with your counsel?

THE DEFENDANT: Yes, ma'am.

THE COURT: Are you ready to enter a plea today with respect to specification 2?

THE DEFENDANT: Yes, ma'am.

THE COURT: What is your plea, guilty or not guilty?

THE DEFENDANT: Guilty, ma'am.

THE COURT: All right. So let's turn to the matter of sentencing.

This may be the longest recital of documents received

in connection with a sentence I have ever delivered, but let's try. And my law clerk may help me out because I haven't printed out everything that you have sent. I have looked at it, but it's not all physically in front of me as it normally would be.

So let's start with the report of the probation department, which is dated April 1, 2021. And let's just deal with this by itself.

Have both parties received a copy of the report?

MR. MAIMIN: We have, your Honor.

MS. BAHARANYI: We have.

THE COURT: Ms. Baharanyi, have you had a chance to review this with Mr. Ferrer?

MS. BAHARANYI: Yes. He has been provided a copy, your Honor.

THE COURT: Apart from your obvious disagreement with the guidelines calculation, do you have any other objections to the report?

MS. BAHARANYI: No additional objections, your Honor.

THE COURT: So, in terms of the sentencing submissions, I think first was the defendant's submission filed on April 28, entitled "Sentencing Submission on behalf of Gregory Ferrer."

Next was the government's letter of May 5.

Then that was followed by the Federal Defender's

submission filed on June 1st, followed by the government's submission of June 14th.

Subsequently -- and I will need a little help on this -- the defense submitted additional excerpts from recent decisions by other judges on the legal issue that we will be talking about shortly. And that was done under cover of letter dated July 16, 2021.

I have not discussed the reality there were exhibits to these various submissions, but have I left out any of the submissions?

MR. MAIMIN: Nothing from the government, your Honor.

MS. BAHARANYI: No. I don't believe so, your Honor.

THE COURT: Not surprisingly, I have spent actually a very considerable amount of time reading through your submissions, reading the cases, or some of the cases, and looking at some of the transcripts from my colleagues.

So, I am prepared to hear any additional argument that either of you wishes to make. I am not sure in this context who should go first. You could choose for it, that would be OK, but I will give you the chance to rebut anybody else. It's really of no moment to me.

MS. BAHARANYI: I will jump in, and I will note that, of course, we do want to focus a good deal of time on 3553(a) factors as well, but my understanding is the Court wants to hear first about the guidelines.

THE COURT: That's fine.

MS. BAHARANYI: Your Honor, we have certainly inundated the Court with a lot of chemistry, a lot of technical arguments, and I am happy to keep it brief at this moment because I do believe we have briefed the issues quite thoroughly.

The main point here, despite what seems to be a very technical argument, is quite simple. New York has decided, through its own laws governing narcotic drugs, to proscribe more substances than the federal government. They decided to do that in two distinct areas that we talked about in our brief, with two distinct substances, one of those being naloxegol. I understand that's an issue that has been raised in Mr. Ferrer's previous court case in front of Judge Koeltl. So I will spend a bit more time on the cocaine isomers.

I think our submissions have perhaps belabored a point that Judge Koeltl seems to understand was far more simple. The New York legislature has decided that it wants to proscribe all isomers of cocaine. It did so through the statute that's been provided by the court. It did not mince words in that statute, even if perhaps it was awkwardly written. And perhaps it was overly broad, but fortunately, we know from the sponsors of the bill, that led to that statute, that they made the specific decision to do away with having to parse through different isomers and to proscribe all isomers, whether geometric,

whether optical, whether constitutional under New York law.

The federal government chose a different approach. The federal government banned only two categories of isomers; those being geometric isomers and optical isomers. The federal government made this carve-out explicit in its own law, whereas the New York legislature decided not to.

Because of this overbreadth with respect to cocaine isomers, there is a mismatch between the New York State statute and the federal Statute. Because of this mismatch, our argument is that Mr. Ferrer's convictions, which are dependent upon New York law, the New York statute, how it defines narcotic drugs, those convictions should not qualify as controlled substance offenses.

THE COURT: Let me just ask you a question. You submitted the affidavit of Dr. Dudley. He says that, if you look at something called SciFinder, which is a chemical database, that there are 12,271 constitutional isomers. I just want to understand. Are you suggesting that New York State law has declared illegal 12,271 isomers, at least?

MS. BAHARANYI: New York State law, by saying that they want to proscribe all cocaine isomers, has in fact, perhaps overly broadly, put those in the category of proscribed drugs.

THE COURT: So the answer is yes.

MS. BAHARANYI: So yes.

I am not saying it's wise. I am not defending them, by any means, but I do think that is what the plain reading of the statute calls for.

THE COURT: OK.

MS. BAHARANYI: Your Honor, I think the government has sort of certainly pushed back when it comes to what the statute says because of their own interpretations, interpretations that aren't aided by chemists, I think interpretations that are aided solely by their position that they don't want the New York law to be broader than federal law. But, plainly, we have provided the Court with legislative history, the text of the statute, the expert opinions of our own chemists, who explained that there is overbreadth, its plain overbreadth, and whether we think this overbreadth is wise or not is not the issue. I think the New York legislature may very well be paying attention to the arguments that we are having in federal court, as they have in the past. They may very well decide to legislate more clearly on this issue, or more narrowly, but they haven't taken that position yet today.

So that the law that we have today, there is an overbreadth when it comes to cocaine isomers. We maintain, although we understand the argument with respect to naloxegol has already raised in the past, but we maintain that there is an overbreadth on that point as well because the New York legislature considers all derivatives of opiates to be

proscribed, unless there has been an exception provided, and no exception has been provided with respect to naloxegol.

So for those two basic reasons, which may seem less basic because of the volumes of paper that we have provided to the Court, but because of those two basic reasons, the New York penal laws that Mr. Ferrer was convicted under do not match, do not qualify as controlled substance offenses, and, therefore, we ask the Court to find his offense level, instead of being 24, is 14 as the base offense level given a two-point credit for acceptance of responsibility as well, your Honor.

I would like an opportunity to discuss the 3553 arguments that we have raised in our initial submission, that may have been lost a bit, but I will wait to answer any questions the Court may have first with respect to the technical guideline arguments.

THE COURT: I think there is an appropriate reluctance on the part of courts to rewrite statutes. Certainly, if this was a civil case involving a contract, no court is required to interpret or construe a contract to create absurd results. To suggest that the New York legislature intended to make 12,271 constitutional isomers of cocaine illegal seems on its face to be absurd. So the question is, is there some point, when it comes to a court considering a statute, that there is a level of sort of unreality or absurdity that they don't have to go to? I guess that's a question.

L7L8FERS

MS. BAHARANYI: Your Honor, I think that the New York legislature can certainly -- they may disagree --

THE COURT: Let me say this, in my view, and I will probably say it later. This mound of paper, the issue is not going to last that long. Whether it's resolved in the Circuit in some way, or it's resolved by the Sentencing Commission, or it is resolved by the New York State legislature, or the Supreme Court, because there is also a case up there -- this is not the only state where this argument is going on -- this will be resolved in short order. Because the reality is that what is being argued about is easily subject to amendment of statutes or the guidelines and really isn't addressing the issue that the defense bar is concerned about. It's a convenient argument now, but your argument really ultimately is about the policy, and an argument, possibly, about double counting. And the government's argument is equally understandable. There are certain kinds of crimes that are taken so seriously that it is appropriate to enhance the offense level if those crimes have previously been committed.

I am just framing the issue. I am not trying to come down on one side or the other, but the reality is that that's ultimately the question. This is an intellectually challenging sideshow, which I predict is going to be resolved, because there are such obvious ways to resolve it that I really find it hard to believe that no action will be taken.

In any event, enough philosophizing about the mounds of papers.

Let me hear from the government.

MR. MAIMIN: Thank you, your Honor.

Before I get into the substance of the argument, I will just say, with respect to the idea of resolution, I agree with you, and I suspect that defense counsel agrees, this is something that will likely be resolved, and we rather it be resolved sooner rather than later. However, I think that currently at the Second Circuit it will take quite some time before it resolves because the only cases up there right now are on a plain error standard, which doesn't actually resolve the issue.

THE COURT: Also, for now, it is limited to the timing question, right? Maybe not.

MR. MAIMIN: It was out of the Western District of New York. We just submitted two briefs in cases that also dealt with the underlying naloxegol and in one case cocaine isomer issue. But yet, because they are on plain error, the Second Circuit doesn't have to, and likely will not, actually resolve it. To the contrary, my guess is they will end up saying, because there were no cases raising this, and in our case, also, there was arguably waiver, there couldn't have been plain error and so we don't need to reach the merits ultimately.

THE COURT: I am just curious since we have gotten off

on this. Part of the issue here has been that the Sentencing Commission has been undermanned, underpersoned.

MR. MAIMIN: There is still no quorum, and I don't believe there have been nominations.

THE COURT: That was my question.

MR. MAIMIN: I assume that it's coming at some point. I certainly hope so.

THE COURT: Yes. There is a lot going on in the country right now.

MR. MAIMIN: Then, in terms of the Supreme Court, I believe, and I don't want the Court to hold me in contempt if I am wrong on this, but I believe that the cases that have been petitioned for certiorari, the Supreme Court deal with states where their statutes specifically proscribe, quote, "positional isomers of cocaine," that is, they carved that out, which isn't really an issue here, and they aren't structured the same as the New York statute. So even if the Supreme Court were to take that up, the argument there is, where the state has explicitly proscribed something, but it looks like it was an accident for a variety of reasons, is that sufficient to ignore it.

THE COURT: Right.

MR. MAIMIN: So, to get to the substance, unfortunately, I think -- I think I will start by answering your Honor's question, which is, is it possible to interpret a

statute to avoid absurdity? And the answer is yes-ish. And what I mean by "yes-ish" is that there is a canon of statutory construction that the court, just like it's supposed to try to avoid unconstitutional interpretations of statutes, is also supposed to try to avoid absurd interpretations of statutes where such an interpretation is also supported by the statute. That's why I say "yes-ish."

There is no question that if New York had written into the statute, we just went onto PubChem or SciFinder and found 12,271 isomers, and we hereby control all of them, even though it might be ridiculous for them to do so, the Court couldn't say that's ridiculous and absurd and therefore I am going to ignore that they said that. But that's not the situation we have here. This is a situation where "yes" absolutely applies because the statute is not specific.

The Second Circuit, in cases like *Townsend* and *Thompson* and *Hylton* and *Harvin*, kept on saying over and over that the way to avoid the, quote, realistic probability test is to look at what the statute does on its face. And the statutes in question here on their face do not proscribe the substances that are in question.

And this is actually very, very important. Because the whole point of the categorical approach is simple. The idea is, when we look at somebody's prior conviction, because the court below is bound only by the law and not necessarily by

the underlying facts, because the jury did not necessarily find the underlying facts but, rather, is told you only have to meet the elements, in theory, is it possible that this person was convicted of a crime which doesn't qualify for the enhancement, effectively to say, which would not have been a federal controlled substance offense?

And *Thompson* and *Townsend* said, well, when you have a violation of New York State law that involves the sale of what New York State defines as a, quote, "controlled substance," New York State's "controlled substance" includes Schedule III(7), which is clorionic gonadotropin, or HCG, or in English human growth hormone, and that is not a federally controlled substance.

So, the Second Circuit said there it's easy. We look at the statute on its face. New York State says you can be convicted of this crime if you possess human growth hormone. The federal government says you cannot be convicted of a controlled substance offense if you possess human growth hormone. Therefore, there is a categorical mismatch, because under the categorical approach we don't get to get into the facts, and we have to assume maybe the fellow was convicted of selling human growth hormone. The categorical approach is asking, before we get to the definition of it, is there a, quote, realistic probability that the defendant was convicted of this crime?

But here, the statutes on their face do not proscribe the substances in question. The schedules in New York State do not have the word "naloxegol" or "naldemedine" anywhere in them. They do not have the word "scopolamine" anywhere in them, which is the sample of a cocaine isomer that I just found with very quick research, this constitutional isomer of cocaine that is readily available by prescription and not as a controlled substance. It does not list any of the other 12,271 substances, except for a handful of them that are controlled in different places.

Rather, defense counsel says, well, look at the statute, and there is a way to read the statute to include naloxegol, to include naldemedine. And my answer is, I don't disagree. There is a way to read the statute to include those. But there is also a very reasonable way not to read it to include those. So the fact that there is a way to read it to include those substances doesn't mean it includes them. It means we have to look a little bit farther.

Well, there is additional evidence that New York State does not seem to consider these anti-constipation medications to be controlled. Among other things, they publish a list of prescription medications that are also controlled substances, and naloxegol and naldemedine are not on that list. And it's not that it's a random rare substance that they didn't think of. These are things that New York State's own Medicare

program says hospitals ought to prescribe these substances. New York State's Department of Insurance has sued insurance companies saying you have to pay for the prescription of naloxegol. So New York State is aware of these substances and does not seem to consider them controlled.

When it comes to cocaine isomers, there are two problems with the statute. One is it doesn't define isomer and it doesn't define as chemically equivalent. And the reason that these are problems is that there does seem to be a divide. As we pointed out in our papers, the whole reason for throwing the word "isomer" into the statute comes out of the isomer defense of the late 70s and early 80s, in which there is court case after court case, including in Second Circuit, that referred to the understanding of lawyers in courts that there are, quote, eight isomers of cocaine. Not 12,271 isomers. Not the 8,000-some-odd that you find on PubChem. There are different databases and they only publish those that are reported to them. I think that Dr. Dudley would agree with me, in all likelihood, there are tens of thousands of additional isomers that aren't even identified on the database. They believe there were eight isomers. Why did they believe that? Because they were talking about optical and geometric isomers, as defined at the time. I say "as defined at the time" because chemists no longer use those terms; they use updated terms that are more precise.

In fact, when defense counsel says, you know something, New York State decided to control 12,000 isomers, there is nothing that says that it decided to control 12,000 isomers. It said, We have a problem because there is the debate about whether things are chemically equivalent, and we are going to write in not "and all isomers of cocaine." We are going to write in "and all chemically equivalent substances, including isomers of cocaine." That is, we are going to tell the courts and juries that at least some isomers of cocaine will fall into chemical equivalence. And that's very important, because when you have a subset, it's necessarily defined by the set.

I think of how hot it is outside. And if you went to a shop that said, We carry every form of ice cream pop, including Haagen-Dazs, you wouldn't be surprised if you walked in and you said, Can I have a pint of Haagen-Dazs?, and they said, We don't have that. We only have Haagen-Dazs ice cream pops. Like we said, we carry every ice cream pop, including Haagen-Dazs. That is, the fact that including Haagen-Dazs means Haagen-Dazs as a subset of ice cream pop tells you that they are talking about every ice cream pop that is Haagen-Dazs and every Haagen-Dazs that is an ice cream pop. It's not every ice cream pop that is Haagen-Dazs therefore means that ice cream pop includes things that are not ice cream pops.

So, grammatically, what they did is they barred all

chemically equivalent substances and they wanted to make clear that included certain isomers. Because under the isomer defense, as discussed not only by the court, but by the sponsor, the concern was defense counsel would go up to analysts and say, You didn't test this substance for d-cocaine -- which is the optical isomer of cocaine -- did you? And the person would say, No, I didn't. They would say, You understand l-cocaine is what is prohibited by the statute? And the person would say, Yes, I do. And they would say, Under your tests, can you tell if it's l-cocaine or d-cocaine? And they would say, Because I don't have a polarimeter, I did not do that test. I don't have this fancy piece of equipment that my understanding is how we tell the difference between optical isomers.

So, the legislators came in and said, let's just get rid of this defense. Let's just say, those other isomers that are chemically equivalent, those will also count as proscribed items. And this happened federally as well. As we pointed out in the legislative history for the federal isomer, the reason it says optical and geometric isomers is because the federal government said we believe that these are the only actual isomers of cocaine that are out there that would fall into this category.

So, at the time, legislators, they understood the word "isomer" to be much narrower than Dr. Dudley's academic

definition. And I am not faulting Dr. Dudley for that at all. Academically he is right. The word "isomer" has a very large general meaning. But it had a very different meaning to these guys, and in New York State at least, they made clear the meaning that they were concerned about, which is they said chemically equivalent substances, including cocaine and its isomers.

I would also point out that defense counsel said in its submission of last Friday, well, you can't really rely on the grammar of the statute, which is an odd thing to say when they are relying on the text of the statute. But they say, you can't really rely on the grammar of the statute because there are clearly scribner's errors. Because the statute says that cocaine is not a compound or mixture made from coca leaves. It says it's a compound or mixture made from a compound or mixture of coca leaves. OK. That's actually correct. Cocaine is not a compound or mixture of coca leaves. Rather, coca leaves are first turned into coca paste, and then coca paste is then mixed with, I think it's gasoline and baked in order to be turned into cocaine. So it's actually quite correct on that. By the time you get to cocaine, you are two steps away from the original coca leaf.

And the problem is that the state did not define chemical equivalence. But, again, looking at the legislative history, the court can get a hint of what chemical equivalence

is, which is, what item that tests positive for cocaine and defense counsel can get up there and say, but it may be this other substance. And the answer is, they said, chemically equivalent substances that are isomers of cocaine we understand will test that way. This is our way of not having to buy polarimeters, and not having to make our analysts do this silly test to see if something is l-cocaine or d-cocaine when they get up there to testify every time.

Dr. Dudley, amazingly, never defines chemical equivalence. He talks at length about what is and is not chemically equivalent, without telling the court what chemical equivalence is, except that later on, in a different discussion, he says, well, chemical equivalence I think of as something that you cannot tell the difference between them using standard laboratory testing. And the sponsor of the New York State bill made clear that that's exactly what he meant by chemical equivalence.

So the Second Circuit has said, when you have something like this where it's unclear, where the statute is not clear on its face, where it doesn't say naloxegol, it doesn't say naldemedine, it doesn't say scopolamine or any of the other 12,271 substances, but rather, it's subject to significant interpretation, it's subject to saying how far can we stretch it, how far do we go before it's absurd, the Second Circuit has said we understand the basic -- the Supreme Court

said this as well -- we understand that the basic concept of the categorical approach is not to come to a totally absurd result. So we will create a realistic probability test that says, when the statute isn't clear on its face and you have to start to stretch the law to figure out what it means, you get to go to a realistic probability, which is, if we want to know is it possible that the defendant was actually convicted for selling scopolamine, or for selling an anti-constipation drug that didn't even exist at the time that he was convicted, defense counsel, it's on you -- and the Second Circuit is clear that this is the defendant's burden once you get to the realistic probability test -- it's on you to find a case, a single case, of somebody, whether it's you or somebody else, who is prosecuted for doing that. And the answer here is, you will see in all of the ink that has been shed on this issue, and there is a lot of it, I understand, defense counsel has not once even pretended that there is an actual chance that anybody has ever been prosecuted for selling naloxegol, naldemedine, or a non-optical, non-geometric isomer of cocaine in New York State as a controlled substance. And that's because New York State clearly does not actually consider those to be controlled substances.

This is the equivalent of, your Honor may recall a few years ago, when there were questions about whether Hobbs Act robberies were crimes of violence for 924(c), the standard

defense line was, you can commit a Hobbs Act robbery by threatening to pour chocolate syrup on somebody's passport, and that surely would not be violent. And the courts came back and said under realistic probability that doesn't work because we can't find a case of anybody who has ever been prosecuted, much less convicted, of committing a Hobbs Act robbery by threatening to pour chocolate syrup on somebody's passport.

That is exactly what is happening here. The statutes are not clear on their face. I will agree that at least with naloxegol and naldemedine, there is a perfectly reasonable interpretation of the statute that allows for those to be controlled by New York, but there is also a perfectly reasonable interpretation that it does not. In fact, every indication is the latter interpretation is the one that New York states. With cocaine it's even more complicated because New York did explicitly say that the substance has to be chemically equivalent to coca leaves without defining it. I don't think that there is, in fact, a reasonable interpretation that 12,271 substances are all chemically equivalent to cocaine, at least that there is a reasonable interpretation that the legislature meant chemical equivalence to mean that. But, again, we always have this backstop that the Second Circuit has laid down, which is just go to realistic probability, and there is no realistic possibility that the defendant was convicted when he was selling crack cocaine for

selling an anti-constipation medication that didn't exist at the time, or an anti-nausea medication that is federally available by prescription, and not as a controlled substance.

Rather, it is indisputably clear, under the statutes and under the framework set out by the Second Circuit and the Supreme Court, that what Mr. Ferrer did was he sold substances that are controlled under federal law. Because of that, his four prior convictions are all controlled substance convictions and his offense level before acceptance of responsibility should be 24.

MS. BAHARANYI: If I may, your Honor.

THE COURT: Just briefly, really.

MS. BAHARANYI: I will make it brief.

I think that we can go straight to the sponsor of the bill to help clarify what -- to push back. I don't have to say much because the sponsor of the bill already made very clear what the statute was intended to cover. This was provided as part of our, I believe our second submission, your Honor, and I am just going to quote from it.

The sponsor of the bill said that the issue here, which is the issue of trying to distinguish between different isomers of cocaine, this issue could be resolved and the statutory loophole closed by enacting this amendment, which would include all isomers of cocaine and the schedule controlled substance.

They chose to take a broad approach to avoid the issues that the government has raised today, to avoid the issues that I am sure will continue to be raised, that it's difficult to distinguish between different isomers of cocaine, that the chemical process of doing so is costly, that the burden on states and municipalities is high.  So instead of even beginning to do that, let's just get rid of the issue and proscribe everything.  And that's what the legislature made clear.  The statute supports this as well, the plain reading of the statute, that the legislature intended to cover cocaine and its isomers.  That is the language.

So, for the government today to say we can get to realistic probability because of a mismatch, frankly, there is no mismatch in the statute.  While it may be true that the New York legislature did not specifically use the word "naloxegol," did not explicitly use the words "constitutional isomers," this may be true.  But it's not about whether the statute omits certain words or includes certain words.  It's whether, on the face of the statute, and the relevant statute, there is broadness.  And on the face of the relevant statute, New York State decided we are going to proscribe all isomers of cocaine. We are going to proscribe derivatives of opiates.  The plain meaning of derivative, and the meaning that our chemist has provided to the Court, is a substance that comes from another substance using chemical processes.  I wish I can go into more

L7L8FERS

detail, but I am not a chemist.

So that's the meaning of it. And the New York legislature had the choice to do what the federal government did and to specifically say we want to exclude naloxegol from this definition. They chose not to do that. The New York legislature also had the ability and the choice to say, we want to create a carve-out to only proscribe geometric isomers, to only proscribe optical isomers. It did not do so. So there is, in fact, a mismatch. We don't get to the realistic probability test because of this mismatch.

We provided the Court with *Williams v. Barr* in our submissions, and that case makes clear that the realistic probability test, according to the Second Circuit, comes into play when the statutes themselves match and yet there is still some ambiguity over its application. And here we don't have any match between the statutes themselves. The federal government chose to carve out certain exceptions that the state did not.

THE COURT: Why don't we spend a little time on the 3553(a) factors. I always feel sort of badly when we wind up having a guidelines discussion and the defendant, who is about to be sentenced, no doubt is, understandably, having difficulty following the discussion and says, essentially, what about me?

So let's get to Mr. Ferrer, because he is really the reason we are here, rather than the interesting discussion we

have been having.

MS. BAHARANYI: Absolutely. Turning to Mr. Ferrer.

Actually, before I turn to him, I do want to turn to his family.

THE COURT: They walked out.

MS. BAHARANYI: Your Honor was able to see at least his mother, Ms. Rosita Ferrer, as well as his niece Iana. And he has a whole host of friends and supporters who also wanted to be here today, but could not be.

I would say this. Mr. Ferrer, as this Court knows, was in this position not terribly long ago in front of Judge Koeltl, and as a result of that case, he served time. He was released into the community, and he had a plan to be successful in the community, a plan that revolved around a program that has an excellent track record of giving people work opportunities, education opportunities, structure and support.

Unfortunately, when Mr. Ferrer came out of prison in April 2020, the world looked a lot differently than what we had ever imagined. At that time, as the Court is aware, the city was going through perhaps one of its darkest periods in history. The death toll from COVID was rising every day at an unimaginable rate. Our offices were closed, as we tried to keep ourselves and our loved ones safe and away from danger. And this is the environment that Mr. Ferrer came into.

This was a moment of chaos that he did not anticipate,

and it was a moment of fear as well.  In order to participate in this program Ready, Willing & Able that was ready for him, he would have to go into a shelter followed by communal housing.  Mr. Ferrer since he was a child has suffered from asthma.  The prospect of going into a space like this, while this respiratory disease was running rampant, was scary for him.

THE COURT:  Is Mr. Ferrer vaccinated?

MS. BAHARANYI:  Mr. Ferrer is not yet vaccinated.

THE COURT:  Mr. Ferrer has been offered a vaccine for months.  So the argument, when he has a chance to protect himself and has not taken it, really undercuts some of what you're saying.

MS. BAHARANYI:  Your Honor, I will push back on that.  The sole vaccine that Mr. Ferrer has been offered quite recently, with very minimal education around its effects, has been the Johnson & Johnson vaccine.

Your Honor, I have at least, I will say, almost every week woken up to articles by the New York Times --

THE COURT:  I am sure that Mr. Ferrer has been reading those, too.

MS. BAHARANYI:  That is correct.  He does try to educate himself as much as he can inside of the system.

THE COURT:  He has made a choice.  He has made a whole bunch of choices.  And this is among the choices.

MS. BAHARANYI: So, without the benefit of the type of education that we have received around it, he has not yet taken the vaccine from the Bureau of Prisons.

THE COURT: It's his choice.

MS. BAHARANYI: I will say this. When he came out of prison in April of 2020, when he was faced with a choice of going into the shelter, he did make a choice then. He returned to his sister's home. He figured physically that was a safer place for him to be. And he made a terrible choice and mistake when he did that. He returned to idle time. There weren't a lot of work opportunities at that time. There was a lot of sitting around. At his sister's home, there was an environment where he was approximate to a lot of old acquaintances who brought him back into a way of life that he did not want to be in. He made a very misguided and terrible decision in that moment to possess two guns.

What he did not do, your Honor, was use those guns. What he has never done is been engaged in any assaultive, violent conduct whatsoever in his history. What he never did, even in this case, was go outside using the guns, wielding them, brandishing them. No. That did not happen, your Honor. But what he did do in possessing them was clearly a mistake.

This is a mistake that he has now spent nearly nine months at the MCC over. Your Honor I am sure has heard time and time again, in different cases, what the conditions at the

L7L8FERS

MCC are like, how brutal those conditions are. The same is true for Mr. Ferrer. When he came into the MCC, he was subjected to lockdowns that lasted sometimes 24 to 48, 72 hours at a time in his cell. These are measures that the Bureau of Prisons said they were taking to protect individuals like Mr. Ferrer. But that was little assurance when in fact the guards were walking around without masks, when in fact other incarcerated individuals in the facility were not in a position to clean their cells, clean themselves, as they needed to, to sanitize their living areas.

He has spent nine months at the MCC terrified of becoming ill. He has spent nine months in the MCC in also overcrowded, rancid conditions, where pests, mice, roaches overrun his living area, overrun the area where he brushes his teeth, overrun the area where he eats. This has been his reality. No one should live through these conditions, your Honor, that he has endured for nine months now, especially not someone like Mr. Ferrer.

As the Court is aware, he is someone who has suffered from depression in the past. This type of isolation, this type of challenging living environment is deeply destabilizing for someone who suffers from these issues, and is certainly risky for someone who suffers from asthma.

I believe that this amount of time that he has served at the MCC warrants a sentence reduction. I also believe the

sentence reduction is appropriate because the plan that he had to go into the community and begin Ready, Willing & Able is a plan that he can now safely implement. Ready, Willing & Able, which is also ready for him, is a 9- to 12-month program, where he will be provided a stipend, training, education, work opportunities, out of the gate immediately. He is in a position now to start that program and to be supported by those structures, unlike in April 2020 at the height of COVID.

And we know right now, too, New York City has dealt with this disease in a phenomenal way. Things were very dark a year ago and now our rates are some of the lowest in the country, and it looks like we are going to continue that trend, even as different variants test that, because of the measures that the city has taken. Mr. Ferrer is confident. He feels that he can be safe and protected while participating in this program, and he is ready to do so. His family is ready for him to do so as well.

Now, I have spent a great bit of time discussing the shortcomings and mistakes of Mr. Ferrer, the difficulties that he has faced, and that has warranted criminal analysis. But I also want to highlight that he is much more than his conviction, he is much more than the criminal history, and he is more than the guidelines analysis. The technical argument we are talking about today doesn't reflect this person. He is a young man with incredible potential. And your Honor has had

the opportunity to read the letters from the two individuals who are closest to him, his mother and his sister. Your Honor has seen that he is someone who cares deeply about his sister, who has treated her child, his niece, as if she is his own. She is here today. They have spent time making up dances. They have spent time learning numbers. They have spent time doing all the things that an uncle can do to take care of his niece. He has always been there for her. He has always been there for his sister and has been there for his family.

This is a time, though, that Mr. Ferrer recognizes he needs to show up for himself. He has not made the commitment, as he needed to, to his own betterment, his own improvement. He had a chance in April to do so with Ready, Willing & Able, but the circumstances were circumstances we could not predict, your Honor. He is in a position to do that, to implement the reentry plan prepared by our office in conjunction with Ready, Willing & Able, to be able to participate in this program as soon as he is released, and we ask that the release happen sooner rather than later.

And with these supports in place, with the type of structure that this kind of program offers, this is a young man who can accomplish a lot. He is not someone who is a lost cause. We know this. Looking at his criminal history, he has never stepped over the line into violent conduct. He has never stepped over the line into assaultive conduct. He has never

L7L8FERS

stepped into domestic violence. That is not Mr. Ferrer. He made unwise decisions due to far too much idle time, which he would recognize and admit to, misguided decisions, but he is someone who is capable of making better decisions and leading a better, more productive life with the right supports in place. And that support system is ready to go today, your Honor. He is ready to join it today and make a difference in his life today.

So, that is the reason why, we understand punishment is warranted, we are not asking for time served, but we are asking the Court to issue a sentence of 12 months and a day, and for that to be the same sentence on his violation, and for the two to run concurrently so that he can begin engaging in those supports already in place in the community waiting for him now.

If there are any questions that the Court has, I am happy to answer them.

THE COURT: No.

MR. MAIMIN: Your Honor, I am going to start by saying something very nice about the defendant from something that I saw that your Honor didn't. Because before your Honor took the bench, Mr. Ferrer's family was in the audience, and I saw him interacting with his niece. And what I saw was genuinely loving, sweet and kind. What that told me, and maybe in my old age I am turning into too much of softy and optimist, is that

Mr. Ferrer has potential. People who can be that loving and sweet and kind to their own family can be good people.

However, the problem is he has refused to fulfill that potential. There was one word, or, rather, two words, one word that your Honor kept using and one word that defense counsel kept using that are in direct contrast, and your Honor was right. Your Honor kept talking about the choices that Mr. Ferrer made. Defense counsel kept talking about the mistakes that he made. But Mr. Ferrer has not made mistakes. Mistakes are something that a young man does foolishly before understanding the consequences of his actions. Mr. Ferrer makes choice and choice again to engage in serious criminal conduct.

I have been at this job an awfully long time. Your Honor, if even possible, has been on the bench longer than that.

THE COURT: I am a lot older than you.

MR. MAIMIN: By at least three years, your Honor.

THE COURT: At least.

MR. MAIMIN: The Court knows how rare it is to find somebody with 21 criminal history points; and yet here we are, with Mr. Ferrer with 21 criminal history points. And those aren't ill-served criminal history points. If your Honor looks at his history, he goes out, commits crimes, gets punished, sanctioned, and comes out, and whether he is on parole or

probation or supervised release, he is undeterred and commits crimes again.

Although much of his crimes seem to come from the fact that he was an inveterate crack dealer, which was the cause of all these various controlled substance offenses, it's not entirely. So, for example, defense counsel says, well, Mr. Ferrer has never engaged in violent conduct, except, of course, that his petit larceny conviction came from an armed robbery with a gun that he committed, which strikes me as awfully violent conduct.

Mr. Ferrer is familiar with guns. Again, he had a gun when he decided to rob somebody and pleaded guilty to petit larceny. He had a gun when he was caught and convicted before Judge Koeltl in a felon-in-possession case. And interestingly enough, in that case he had an excuse, just as he kind of sort of does now. The excuse he gave in that case, it's in the PSR, was, because he had been stabbed once in his life -- and circumstances that are a little bit vague -- he felt that he needed a gun for protection, and that was a mistake that he made. Except it wasn't a mistake. It was a choice that he made. Because he committed crime and crime again.

Now he gets out, and now he knows, even if I want a gun for protection, I am not allowed to have it. How does he know that? He just got 30 months from Judge Koeltl for doing exactly that. So what does he do? He comes out, and he

doesn't do Ready, Willing & Able. Rather, he makes a choice and a choice and a choice again. He makes the choice to get the pink gun. He makes the choice to get the black gun. So now it's not just for self-protection. Does he think somebody might have a knife and he needs two guns on him? No. You have multiple guns for aggression. And aggression it sure is, because he brags on social media about what he is going to use the guns for. Defense counsel says there is nothing violent about him. That's not what he says. He says, I am going to put a hit out on rival gang members. The person who reports this seems to get all the details right. Pink gun. In his house. He is on -- the person said probation. We know it's supervised release from a federal gun charge. That's what Gregory Ferrer has.

Defense counsel keeps on saying, well, the problem here is that COVID had just stricken New York. That makes no sense. Did Mr. Ferrer think that he was going to shoot COVID? Did he think that when the doctor came with a vaccine that he would refuse, that he would have to gun him down, a gun in each hand? No. He didn't have his guns because of COVID. He had his guns because he chose to do what he had done over and over again, which is to be a gun-holding criminal, which is to be somebody who has said, I don't care what the system tells me I can and cannot do.

And he was on greater warning that this was illegal

than anybody else. He was literally on supervised release for doing precisely the same thing. Having pleaded guilty to possessing a firearm while a felon, he comes out, and his first instinct is, I now need to get two firearms. My mistake before was having just one.

The fact that he didn't engage in violence with those guns isn't because of lack of intent. He made his intent clear. His intent is followed by the fact that one of his tattoos says, "God forgives, I don't." And he is clearly somebody who plans to carry through with that. He has demonstrated time and time again that he is a fundamental danger to society. And, moreover, his criminal history, the rapidity with which he returns over and over to significant felonious and/or armed criminal conduct, after getting out of prison and while under some form of supervision, again and again, shows that he is, frankly, for lack of a better word, incorrigible.

This Court should incarcerate Mr. Ferrer for all the various 3553(a) factors, but most importantly, to help protect society. Mr. Ferrer has shown by his actions, not his words here through his counsel, but by his actions, that despite the fact that he has the potential to be a good man, he has made the choice not to be. He has made the choice over and over again that he will be a criminal, that he will deal drugs, that he will act on behalf of his gang, that he will be violent,

that he will carry guns. And I think that after this record there is little question that your Honor is going to see him again after he gets out on supervised release. The Court's best idea should be to put that off as long as possible.

Accordingly, a guideline sentence on the underlying charge, the substantive charge, would be appropriate. Moreover, a consecutive guideline sentence would be appropriate for the violation of supervised release. As your Honor knows, the guidelines recommend that a supervised release violation sentence run consecutively, and the Second Circuit has approved of that, and the reason that that is is that the idea is that they are two separate offenses.

His violation of supervised release was not for carrying the gun. It was violating the court's trust. And Judge Koeltl put trust in him. Judge Koeltl said, despite the fact that you're in Criminal History Category VI, despite your lengthy record -- now lengthier because of what he has done -- I am going to give you a chance and let you get out on supervised release and see how you do. And we saw exactly how he did. He immediately violated supervised release. He immediately said, this court shouldn't have put trust in me because I am going to do something, and this isn't something where somebody makes a mistake. He said, I am going to go out. I am going to get myself some guns. I am going to threaten people on social media with it. Damn the consequences. At

this point, the Court has to show there are, in fact, consequences not to be dammed.

Accordingly, the government believes that a guideline sentence on the underlying count and a guideline sentence on the VOSR to run consecutively would be sufficient, but not greater than necessary, to satisfy the 3553(a) factors.

MS. BAHARANYI: If I may briefly, your Honor.

I am somewhat disturbed by what I have heard today. To this say that this young man is a criminal, to devalue who he is outside of this case --

THE COURT: He is in Criminal History Category VI all on his own. It has nothing to do with the intellectual discussion that we have been having. Criminal History Category VI on his own.

Look, we all know that nobody is the worst thing they have ever done. We know that. But there is nothing wrong with describing this defendant as a convicted felon. His crime is the possession of a weapon as a convicted felon. His last crime was to possess a weapon as a convicted felon. I think that argument is just over the top.

MS. BAHARANYI: I do not believe Mr. Ferrer is incorrigible.

THE COURT: Well, that can be your opinion, and you should advocate for that, and I am sure his mom believes it too, and he persuaded Judge Koeltl of that the last time.

MS. BAHARANYI: I do not believe he is without hope. I do believe, as your Honor just said already, that he is more than his criminal history. I believe he has shown that even -- certainly, he has made mistakes, he has made choices that have been bad choices, mistakes that have been bad mistakes, but he has also shown up for his family in ways that are remarkable that I think should be acknowledged. He has shown up for himself even at the MCC self-studying. Despite the pretty chaotic and difficult circumstances that he has been in, he has not stopped to better himself in that space as well.

The reason why Judge Koeltl gave him a chance, your Honor, is in part because he believed in the potential that he had, and how that can manifest with the supports in place. Unfortunately, the supports in place were in place during a time that was a time that Judge Koeltl could not have predicted. COVID was not something any of us imagined back in 2018 when he was first sentenced.

So what I am asking this Court to focus on in this case is -- certainly, he will be punished. He has experienced punishment every day at the MCC. He has had time to reflect on the promises that he made to the court in the past, and he knows that what he did was wrong. But he has a program in place that is going to do better than any Bureau of Prisons facility in ensuring that he doesn't come back here today. He has a program in place that's going to get him the sort of job,

the sort of community, the network that will allow him to be a constant presence in his mother's life, in Iana's life. The Court can certainly choose to look -- in fact, you must consider criminal history. We own up to that. We know it's bad. He is disappointed in himself. But what is different here is the opportunity to correct the course. More prison is not the way that we correct the course in Mr. Ferrer's life. Structure, community support, work, education, that's the way that we correct the course in this young man's life.

I do want to be clear about some of the allegations that were raised today. He has never pled to any robbery. I believe the tip that was called into the FBI, they never could find any social media posts that were allegedly posted. No one has ever seen that. The prosecutor hasn't seen that. I haven't seen it. Mr. Ferrer knows however. There is no point in getting into the weeds on that because he knows ultimately, even deciding to have an inoperable pink firearm for decoration, deciding to have another one, thinking that this could decorate his home one day, was misguided, the worst decision he could have made. And it's the type of decision that idle minds make. He will not be idle when he comes out. He will not be sort of listless once again in the community.

So I am asking the Court to give him the opportunity that we envisioned for him in April 2020, but that we could not quite put into place given the circumstances that the world was

facing. Our office wasn't able to be there for him in the same way that we would be for someone who is coming out because we, too, were dealing with the chaos and the death due to COVID.

THE COURT: What Mr. Ferrer did is not your responsibility, it's not his mother's responsibility; it's his own responsibility. So there is no need for you to apologize.

MS. BAHARANYI: We understand that. I think he understands that as well. He understands that this is the last of it. He is not coming back here, your Honor. With the right supports, I think we have an actual chance of changing the course that he has been on for too much of his life. If he is at Ready, Willing & Able, if he is in mental health treatment in the community, as is mandated by probation, if he is reconnected -- I will note that even while he was out, he had been engaging in drug treatment; he had been engaging in mental health treatment. What he did not have was a good productive use of his time, and that will be a changed circumstance. He is able to do that safely, and we ask the Court to allow him to do that sooner rather than later. Because he is a young man who has tremendous potential. As the prosecutor noted, he is a young man who has a tremendous amount of love in his heart for his family, and he can do better. He has seen today the effect that this proceeding has had on his family, and I don't think he is going to be down this path again, your Honor.

With that, we renew our request for 12 months and a

day.

THE COURT: Mr. Ferrer, there has been a lot of discussion in the courtroom today about some issues that have an impact on your guidelines and about you. So this is your opportunity to speak.

THE DEFENDANT: I want to start by saying I apologize for possessing a firearm. And I also want to apologize for having my mother sit here in the courtroom, and I know that she will be at work.

I also realized that I spent a lot of time, most of my 20s in prison, and I am working on my 30s in prison, and I wasted a lot of time in prison, basically.

As far as "God forgives, I don't," I got that tattoo because I was assaulted and people told me to forgive the person that did it to me. And, also, I got cheated on, and I felt like I got that tattoo for that reason.

And as far as the, how could I say, the grand larceny conviction, that was my past. If you was to read the statement, I didn't harm nobody on that specific date. I didn't possess no firearm. I didn't do nothing. I was just there at the moment when it happened. I didn't hurt nobody. I didn't fire a firearm. I didn't brandish. Basically, I know that I made mistakes in my life, and I wasted a lot of my years in jail, and I can't get none of that back.

My mom asked me last year, when she gets older, if I

want to take care of her when she can't take care of herself no more, and I told her yes. And me continuing this criminal lifestyle, I'm not gonna be able to do that, and I can't see my mother being taken care of by another person.

So, I am closing this chapter in my life. Yes, I made mistakes. Yes, I know I was wrong for possessing a firearm. Yes, I know I came out and possessed two more firearms. It was my stinking thinking that got the best of me. I was thinking in my mind that it was all right to have a firearm as long as I am not hurting nobody or none of that. Like my lawyer said, I wanted it for decoration. I wasn't out there robbing people, shooting people, none of that. I just had possession of the firearm.

I know that I want a family one day. I know that I want to make my mother proud of me. I made a foolish decision to possess a firearm. But I am not a bad person. I'm not a violent person. I am ready to change my life around because I am not getting any younger. My mother, she is getting older, and I am tired of disappointing her and tired of disappointing myself. This is the end of my role. I can't do this no more. I really care about my mother, and she's getting older. She asked me that question last year. My family being hurt while I am in here, it hurts me knowing that they are going through things that I can't control. I am just ready to change my life.

As far as the vaccine, when I was in the street, I heard stories, like rumors, about them putting the coronavirus inside of you, and that's the reason why I haven't gotten the vaccine. Recently, I just read on the news that Johnson & Johnson vaccine has side effects. I just feel like when I came out last year, it was scary, I seen celebrities and people with money dying from this. And I almost died when I was a little kid from asthma, and them putting me in the shelter to go to this program would have killed me. So I didn't go to the program.

THE COURT: But you're not being charged with failing to go to the program. That just isn't part of this case.

THE DEFENDANT: I understand, your Honor. The problem is me possessing the firearm. I know. But like I said, your Honor, I felt like -- I know I was wrong for possessing a firearm. I know I signed stipulations. I wasn't hurting nobody out there. I wasn't doing nothing bad. I was just taking care of my family.

That's all I got to say.

THE COURT: All right. Let's address first the guidelines issue that --

MS. BAHARANYI: Your Honor, if I may have one moment to speak with him.

THE COURT: Yes.

MS. BAHARANYI: Your Honor, this isn't so much related

to the allocution, just about the anonymous tip that we had been discussing before. That the tip itself referred to an intersection that did not exist.

THE COURT: I don't care.

MS. BAHARANYI: I just wanted to give an explanation.

THE COURT: It doesn't matter to me. The time frame is sufficient regardless of the tip.

MS. BAHARANYI: He had the firearms, that's true.

THE COURT: That's all that matters.

MS. BAHARANYI: The allegations were not true.

THE COURT: OK. As I said, returning to the guidelines issue.

Both parties have drowned us in paper, which frankly did little to clarify the issues that you sought to present. If I resolve the isomer issue against the government's position, it resolves the timing issue and moots the naloxegol issue.

Having thought about this for a long time, I feel compelled to concur with the results reached by Judges Garaufis and Koeltl. Even though I don't believe that the New York State legislature actually intended to include positional isomers in the term "all isomers," the reality is that positional isomers of cocaine are laboratory creations and have never been in the stream of commerce. Moreover, to the extent that the New York State legislature was concerned about

L7L8FERS

laboratory testing expense, that is irrelevant to positional isomers, which would not test positive in NMR spectroscopy.

MR. MAIMIN: Spectroscopy.

THE COURT: Nonetheless, the term is "all isomers," and I cannot rewrite the statute.

However, the New York legislature and the Sentencing Commission can rewrite the statute and the guidelines to cover cases like Mr. Ferrer's, which I believe that the Sentencing Commission intended to reflect his prior criminal history in the calculation of his offense conduct.

The record should also be clear that the sentence that I intend to impose on Mr. Ferrer is unaffected by the outcome of what I find often to have been somewhat an academic argument. If the naloxegol argument was presented on its own, I would easily resolve it in favor of the government.

Turning to Mr. Ferrer.

First, the guidelines are now 30 to 37 months. The recommended guidelines on the supervised release violation are 21 to 27 months.

Listening to Mr. Ferrer, one would have thought we were back in front of Judge Koeltl on November 16, 2018. At that time, Mr. Ferrer said, "I would like to say, your Honor, that I would like to apologize for the possession of firearm. I'm not the same person I was last year. I made changes in my life. I joined programs in MCC to better myself. I just

regret, basically, the day I possessed the firearm, and I know that it was a foolish thing to do, to walk around with the firearm, and I just want to apologize. I want also to apologize to my mother" -- an apology, I might say, is well deserved -- "because I let you down again, and I know you would be at work and you got to be here to show some support. And I am basically ready to better myself when I get released and not come back to this place."

OK. That is essentially what we heard today again.

Judge Koeltl made it clear, after giving Mr. Ferrer a very generous 30-month sentence -- generous not just because of his guidelines findings, but generous because Mr. Ferrer had received numerous two-year sentences before. So only giving him six months more than a prior high sentence is generous. Judge Koeltl said, "Remember, when you are on supervised release, any violations of supervised release come back to me, and I have a very long memory. You say you have changed."

Then he says, "The conditions of supervised release are strict, with respect to violating any federal, state or local laws and remaining drug free. If you violate any of those provisions, you are back before me, and as I told you at the time that I took your plea, if you violate the conditions of your supervised release, you can be sentenced to prison for the term of your supervised release without any credit for any time that you had already spent on supervised release. So a

violation of supervised release can have serious consequences for you."

And Judge Koeltl also, before imposing sentence, had occasion to talk about choices as well. And he said, "I want to make it clear at the outset that there is nothing in the submissions before me from which the defendant's mother should take away any sense of personal responsibility. What people do with their lives are personal choices. It's plain that the defendant's mother has worked extraordinarily hard over the years and is very supportive of the defendant, and the defendant's mother should take some comfort in that and certainly not take away from this process any sense of failed personal responsibility."

Judge Koeltl went on to say, "People make their own choices and lead their own lives, and it's plain that the defendant's mother has tried extremely hard to support the defendant, as the defendant himself has said."

I echo Judge Koeltl's comments about the limits of parental responsibility.

The reality here is, despite all that, within six months of being released from prison, Mr. Ferrer was arrested again for the exact same crime that he had been sentenced to by Judge Koeltl. The other reality is that Mr. Ferrer has accumulated enough crimes to have 21 criminal history category points and place him into Criminal History Category VI, without

any special enhancements for his prior crimes.

Words are simply that, words. And there just comes a point where, after someone has been shown consideration by the court and then proceeds to go out and commit the exact same crime, that words no longer suffice.

The punishment for this defendant is key, as is the safety of the community. When one has a gun, the temptation is to use it.

So, first, for 20 Cr. 650, the offense, I sentence Mr. Ferrer to 37 months. It simply makes no sense to give him the same sentence that Judge Koeltl gave him the last time.

I place him on supervised release for three years. There is a $100 special assessment. And I impose all of the mandatory, standard and special conditions set out at pages 27 through 29 of the presentence report. It may go over to 30.

(Continued on next page)

L7lWfer2

THE COURT: With respect to the supervised release violation, as I said earlier, the recommended guidelines there was 21 to 27 months. The probation department recommended 24 months.

MR. MAIMIN: Your Honor, just to point out, the guidelines say 21 to 27, but there's a statutory cap of 24.

THE COURT: OK. Thank you.

Thank you.

All right. I agree that time spent in custody during Covid is exceptionally harsh, so this is where I would give Mr. Ferrer credit for that time and impose a sentence of 11 months for his supervised release violation, specification 2 to which he pleaded this morning.

I suspect that there are no open counts.

MR. MAIMIN: I know of no open counts.

Does the 11 months run consecutively?

THE COURT: Yes, absolutely.

MR. MAIMIN: And will your Honor be imposing supervised release on the violation as well?

THE COURT: No. So then when he is released on that, his three years of supervised release from the underlying crime.

And let me advise Mr. Ferrer that he has 14 days to appeal my sentence.

My law clerk points out that I said that the New York

statute says "all isomers." In fact, the legislative history says "all isomers." The statute says "isomers." It doesn't change my ruling, but I appreciate the clarification.

Is there anything further at this time?

MR. MAIMIN: I think your Honor has to set forth the conditions of supervised release.

THE COURT: I thought I did by saying they're all the conditions that are set forth --

MR. MAIMIN: OK.

THE COURT: I hope that is sufficient, because we would otherwise be here for many minutes accomplishing nothing as a practical matter. Mr. Ferrer has a copy of the presentence report. All of the mandatory, standard and special conditions in there are imposed, word for word, and when Mr. Ferrer is released to probation's supervision, he is given a document to sign. I presume that the probation officer reviews it with him. It seems to me that is ample notice.

I'm not unaware of the Second Circuit case, but until instructed, I'm going to proceed the way I always have, which I think is more than sufficient, in my view.

MS. BAHARANYI: Your Honor, Mr. Ferrer's family lives in the New York City area. I don't know how much power the Court has in helping persuade the BOP --

THE COURT: I can make a recommendation that he be housed in the New York City area to facilitate family visits.

I have no problem doing that. Obviously, I don't have any idea these days what the crowding situation is in different areas. But I have no problem with that.

MS. BAHARANYI: We have a sort of somewhat (inaudible) request. He's currently at the MCC. Our fear is that he might be moved to the MDC before being designated, so if there's a way for the Court, and our fear for that reason is the cases of Covid; we would ask if the Court could include in its judgment a recommendation that he be kept at the MCC.

THE COURT: I can't get involved in the movement of prisoners.

And once again, let me say it just so that there's no doubt. The fact that he's chosen not to be vaccinated does not play any role in my sentence. I was well aware of what I was going to do, having spent so much time on the legal issues, I obviously spent a good deal of time on the sentencing. My comments are just if one is concerned, if you are someone with asthma, that while there may be -- and no one's going to say that there aren't some risks with respect to all of the vaccines. People can have allergic reactions to them. There are rare instances of more serious what we would call side effects. But the alternative is potentially death. Some unknown risks, which may never happen and do not happen in any broad way versus if you get Covid now, if you get the variant, your chances of dying are huge. To me that's an easy decision.

A little risk—death.

I can assure you as soon as I was eligible I made the appointment by 8:30 that morning. I don't know if it's any comfort, but there's no one —— not a family member, not a friend of mine, not a colleague —— who has not gotten the vaccine. It's your decision, but part of the problem is that if you were released, if I gave the sentence your lawyer requested, if you're not vaccinated, you can get Covid. You may not even know you have it, and you could have passed it on to your niece, because she can't get vaccinated. She's too young.

You have to understand that unvaccinated people can be carriers of this virus without knowing it, and it endangers others. So if you want to think about others, it's a win—win. It's good for you and good for the rest of the world. And the problem is that there are just, unfortunately, too many people who, for whatever reason, are reluctant. And they are endangering every one of the rest of us. You and I are going to have no contact, so this is not personal, but I find that unacceptable.

Anyway, let me assure you this conversation has nothing to do with the sentence. Nothing. Absolutely nothing.

MS. BAHARANYI: That's all for us, your Honor.

THE COURT: All right. Thank you. Very good.

MR. MAIMIN: Thank you, your Honor. (Adjourned)